1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHARLENE WHITE, | Case No.: 1:23-cv-00113 JLT CDB |
| Plaintiff, | ORDER GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION |
| v. | (Doc. 5) |
| CONDUENT COMMERCIAL SOLUTIONS, LLC, | |
| Defendant. | |

Charlene White, a former employee of Conduent Commercial Solutions, LLC, alleges that CCS engaged in discriminatory and retaliatory conduct in connection with her employment. (*See* Doc. 1-1 at 3-17 ("Complaint").) She seeks to hold CCS liable under California law, namely California's Fair Employment and Housing Act. (*Id.*) CCS removed this action from Kern County Superior Court and now seeks to compel arbitration, asserting that White agreed to arbitrate claims arising out of her employment. (Docs. 1, 5.) For the reasons set forth below, the motion is **GRANTED**.

**I.     Background and Allegations**

CCS is a wholly owned subsidiary of Conduent Business Services, LLC. (Doc. 5-2, Declaration of Diane Wright ("Wright Decl.") ¶ 3.) CBS and CCS (collectively "Conduent")[1] provide

---

[1] Because there is no dispute that CCS is a proper party to this action or the relevant agreements, the Court finds reference to CBS, individually, is unnecessary. Thus, insofar as the Court has occasion to do so, it will also

1

1   a full range of outsourcing services and solutions to businesses. (*Id.* ¶ 4.) White was hired to work for

2   CCS in June 2017. (Doc. 7-2, Declaration of Charlene White ("White Decl.") ¶ 2.) According to

3   White, she was not provided with an arbitration agreement or dispute resolution program form to sign

4   at that time. (*Id.* ¶ 3.) White took a leave of absence in June 2019 and was rehired by CCS in

5   September 2019. (*Id.* ¶ 4.)[2] During the rehiring process, White alleges that as a condition of

6   employment, she was required to electronically sign various onboarding paperwork, which agents of

7   CCS assured her were the same forms she had signed when she initially began working for CCS in

8   2017. (*Id.* ¶¶ 5-6.) White contends she "signed the paperwork, including the employment documents

9   containing the arbitration clauses, without sufficient time to review[.]" (Doc. 7 at 8, citing White Decl.

10  ¶¶ 4-5.) She also asserts that she was never asked whether she agreed to arbitration and "do[es] not

11  recall being provided with, seeing, reviewing, or signing, in any way, any document entitled Dispute

12  Resolution Policy, or any other arbitration agreement." (White Decl. ¶¶ 7-8.)

13          During her employment with CCS, White alleges she was "a hardworking and steadfast

14  employee, who performed her job duties competently and efficiently." (Complaint ¶ 10.) On January

15  26, 2022, White submitted a doctor's note indicating White's medical need to be off work until

16  approximately March 8, 2022, in connection with her outpatient therapy for Post Traumatic Stress

17  Disorder. (*Id.* ¶ 11.) Then, on February 3, 2022, White injured her hand, which required urgent care.

18  (*Id.* ¶ 12.) She submitted to CCS a doctor's note for this instance as well. (*Id.*) On February 7, 2022,

19  White contracted the COVID-19 virus and submitted another doctor's note. (*Id.* ¶ 13.) Despite

20  consistently updating her supervisor as to her condition, White was terminated on February 16, 2022.

21  (*Id.* ¶ 14-15.) She alleges she was terminated "due to her qualified disabilities and for exercising her

22  rights under the FEHA." (*Id.* ¶ 15.)

23          White filed a lawsuit in state court, asserting the following causes of action: (1) disability

24  discrimination in violation of California Government Code § 12940, *et seq.*; (2) failure to

25  accommodate disability in violation of California Government Code § 12940(m); (3) failure to engage

26

27  _____

individually refer to CBS as "Conduent."

28  [2] Although the parties dispute the reason for White's initial hiatus from employment, they do not dispute that
White was rehired in 2019. (*See* Doc. 5 at 5; Doc. 7 at 6.)

1   in interactive process in violation of California Government Code § 12940(n); (4) retaliation in

2   violation of California Government Code § 12940(h); (5) failure to prevent discrimination and

3   harassment in violation of California Government Code § 12940(k); (6) wrongful termination in

4   violation of public policy; (7) intentional infliction of emotional distress; and (8) unfair competition in

5   violation of California Business and Professions Code § 17200, *et seq.* (*See generally* Complaint.)

6        CCS removed the action to this Court and subsequently filed the motion to compel arbitration

7   now pending, arguing that White's complaint was filed "in direct contravention" of the parties'

8   contractual agreement to individually arbitrate all employment disputes. (*See* Doc. 5 at 4-5.) CCS

9   observes that White "agreed to be bound by Conduent's [Dispute Resolution Plan] on at least two

10   occasions:" when she electronically signed the "DRP – Applicant Agreement" as part of her

11   application process with CCS, and when she electronically signed the "Conditional Offeree

12   Agreement" during her onboarding process. (*Id.* at 5-6.) Thus, CCS contends White should be

13   compelled to submit her claims to individual arbitration and dismiss this matter. White filed an

14   opposition to the motion, (Doc. 7), to which CCS replied. (Doc. 8.)

15        **A.        The Dispute Resolution Plan**

16        Conduent's Dispute Resolution Plan ("DRP") was implemented to resolve "all Disputes …

17   between [Conduent] Employees and Applicants for employment, including but not limited to those

18   Disputes related to or arising out of a current, former or potential employment relationship with

19   [Conduent]." (Doc. 5-2 at 9, DRP § 1.) The DRP defines a "Dispute" as "all legal and equitable

20   claims, demands, and controversies, of whatever nature or kind, whether in contract, tort, under

21   statute, regulation, or ordinance, or some other law, between persons (which include Employees,

22   Applicants and [Conduent]) bound by the DRP or by an agreement to resolve Disputes under the DRP,

23   or between a person bound by the DRP and a person or entity otherwise entitled to its benefits …."

24   (DRP § 2.e.) Such claims include, *inter alia*, those "related to or concerning the relationship between

25   … the Employee and [Conduent] alleging violation of any federal, state, or other governmental law,"

26   including, but not limited to, allegations of unlawful retaliation, discrimination or harassment based on

27   disability status, infliction of emotional distress, wrongful discharge, failure to pay wages, and claims

28   for benefits. (DRP § 2.e.vii.)

Under the DRP, "[a]ll Disputes not otherwise resolved by the Parties shall be finally and conclusively resolved through arbitration under this DRP, instead of through trial before a court (including a jury trial)." (DRP § 4.b.) Additionally, parties may only engage in individual arbitration to resolve their disputes. (*See* DRP § 4.c.) Class, collective, consolidated, and representative actions are not permitted. (*See id.*)

**B.      The Applicant Agreement**

The "DRP – Applicant Agreement," or "APPLICANT AGREEMENT TO BE BOUND BY THE CONDUENT BUSINESS SERVICES DISPUTE RESOLUTION PLAN ("DRP") Otherwise Referred to as the 'Applicant Mandatory Arbitration Agreement' or 'Agreement'," provides:

> **I UNDERSTAND THAT BY SUBMITTING AN APPLICATION TO CONDUENT, I AM ACCEPTING AND CONSENTING TO BE BOUND BY THIS AGREEMENT AND THE DRP, BEFORE, DURING, AND AFTER TERMINATION OF, MY EMPLOYMENT WITH CONDUENT.**
>
> **I UNDERSTAND THAT THIS AGREEMENT AND THE DRP AFFECT MY LEGAL RIGHTS BUT THAT ALL LEGAL REMEDIES AVAILABLE TO ME IN A COURT OF LAW ARE AVAILABLE TO ME IN ARBITRATION UNDER THE DRP.**
>
> **I UNDERSTAND THAT THIS AGREEMENT AND THE DRP REQUIRE THAT DISPUTES REGARDING THE MATTERS SUBJECT TO THIS AGREEMENT AND THE DRP BE SUBMITTED TO ARBITRATION RATHER THAN TO A JUDGE AND/OR JURY IN COURT AND THAT BY AGREEING TO BE BOUND BY THE DRP I AM GIVING UP ANY RIGHT I MIGHT OTHERWISE POSSESS TO HAVE A JURY OR JUDGE TRIAL.**
>
> **I HAVE READ THIS APPLICANT MANDATORY ARBITRATION AGREEMENT AND AGREE TO ITS TERMS. I HAVE HAD THE OPPORTUNITY TO READ THE DRP AND I ALSO AGREE TO BE BOUND BY ITS TERMS.**

(Doc. 5-2 at 25-27, Exh. 2 to Wright Decl.) A checked box appears before the last paragraph. (*Id.*) Below the last paragraph is the typed name "charlene white" and "9/26/19 11:50AM." (*Id.*) The final line of the Applicant Agreement states: "(checking the checkbox above is equivalent to a handwritten signature)." (*Id.*)

**C.      The Offeree Agreement**

The "DRP – Offeree Agreement," or "APPLICANT AGREEMENT TO BE BOUND BY THE CONDUENT BUSINESS SERVICES DISPUTE RESOLUTION PLAN ("DRP") Otherwise Referred

to as the 'Applicant Mandatory Arbitration Agreement' or 'Agreement'," provides, in relevant part:

> **I AGREE THAT BY SERVING AS AN EMPLOYEE OF CONDUENT AFTER I EXECUTE THIS AGREEMENT, I AM ACCEPTING AND CONSENTING TO BE BOUND BY THIS AGREEMENT AND THE DRP, BEFORE, DURING, AND AFTER TERMINATION OF, MY EMPLOYMENT. I UNDERSTAND THAT MY FAILURE OR REFUSAL TO SIGN THIS AGREEMENT, OR ANY ATTEMPT TO REJECT THIS AGREEMENT AND/OR DRP, SHALL NOT PRECLUDE ENFORCEMENT OF THE DRP.**
>
> …
>
> **I ACKNOWLEDGE THAT I HAVE READ THIS AGREEMENT AND HAD THE OPPORTUNITY TO READ THIS THE [sic] DRP.**
>
> **I HAVE READ THIS CONDITIONAL OFFEREE MANDATORY ARBITRATION AGREEMENT AND AGREE TO ITS TERMS. I HAVE HAD THE OPPORTUNITY TO READ THE DRP AND I ALSO AGREE TO BE BOUND BY ITS TERMS.**

(Doc. 5-2 at 28-30, Exh. 3 to Wright Decl.) The signature line below these statements contains a checked box, followed by the typed name "charlene white" and "9/26/19 1:41PM." (*Id.*) The final line of the Offeree Agreement states: "(checking the checkbox above is equivalent to a handwritten signature)." (*Id.*)

## II.   Legal Standards

### A.   Motions to Compel Arbitration

The Federal Arbitration Act applies to arbitration agreements in any contract affecting interstate commerce and "governs the allocation of authority between courts and arbitrators." *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008); 9 U.S.C. § 2. The FAA provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision "create[s] a body of federal substantive law of arbitrability applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). A party seeking to enforce an arbitration agreement may petition the Court for "an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.

To determine whether to grant a motion to compel, the Court must consider two "gateway" questions: (1) "whether there is an agreement to arbitrate between the parties; and (2) whether the

agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (2015). "If the response is affirmative on both counts, then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms." *Chiron Corp. v. Ortho Diagnostic Sys.*, 207 F.3d 1126, 1130 (9th Cir. 2000); *see also Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 475 (9th Cir. 1991) ("The standard for demonstrating arbitrability is not a high one; in fact, a district court has little discretion to deny an arbitration motion, since the [FAA] is phrased in mandatory terms.").

Because arbitration is a creation of contract, a court may compel arbitration only when there is a "clear agreement" to arbitrate between the parties. *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1092-93 (9th Cir. 2014) (citations omitted). "When determining whether a valid contract to arbitrate exists, we apply ordinary state law principles that govern contract formation." *Id.* at 1093 (citing *Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 782 (9th Cir. 2002)). The party seeking to compel arbitration bears the burden of demonstrating the existence of an arbitration agreement. *Prostek v. Lincare Inc.*, 662 F. Supp. 3d 1100, 1109 (E.D. Cal. 2023) (citing *Reichert v. Rapid Invs., Inc.*, 56 F. 4th 1220, 1227 (9th Cir. 2022); *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014)). The "initial burden to show an agreement to arbitrate" may be met merely "by attaching a copy of the arbitration agreement purportedly bearing the opposing party's signature" to the motion to compel arbitration. *Espejo v. S. Cal. Permanente Med. Grp.*, 246 Cal. App. 4th 1047, 1060 (2016). If a plaintiff "challenge[s] the validity of that signature," a defendant is "then required to establish by a preponderance of the evidence that the signature [is] authentic." *Id.*

A party opposing arbitration has the burden to demonstrate the claims at issue should not be sent to arbitration. *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 81 (2000); *see also Mortensen v. Bresnan Communications LLC*, 722 F.3d 1151, 1157 (9th Cir. 2013) ("the parties challenging the enforceability of an arbitration agreement bear the burden"). An arbitration agreement may "be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 340 (2011) (quoting *Doctor's Assocs. Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). In addition, a party may show a claim should not be sent to arbitration if the right to arbitration has been waived. *Fisher v.*

1   *A.G. Becker Paribas Inc.*, 791 F.2d 691, 694 (9th Cir. 1986).

2          Finally, upon determining that arbitration is appropriate, a court shall either stay or dismiss the

3   action to allow arbitration proceedings to occur. *See* 9 U.S.C. §§ 3, 4. The action must be stayed,

4   rather than dismissed, if a party requests such a stay, pending arbitration, and the sole basis for

5   dismissal is that all claims are subject to arbitration. *Smith v. Spizzirri*, 601 U.S. 472, 475-76 (2024).

6          **B.      Authentication of Electronic Signatures**

7          California formally recognized the validity of electronic signatures when it enacted the

8   Uniform Electronic Transaction Act, effective January 1, 2000. Cal. Civ. Code § 1633.1 *et seq.* The

9   Act provides that a "signature may not be denied legal effect or enforceability solely because it is in

10  electronic form." *Id.* § 1633.7. It also provides that:

11                  An electronic record or electronic signature is attributable to a person if it
                    was the act of the person. The act of the person may be shown in any
12                  manner, including a showing of the efficacy of any security procedure
                    applied to determine the person to which the electronic record or
13                  electronic signature was attributable.

14  *Id.* § 1633.9. Both California state and federal courts have addressed the use of a login username and

15  password when examining whether an "act" is attributable to a particular person. In *Smith v. Rent-A-*

16  *Ctr., Inc.*, 2019 WL 1294443 (E.D. Cal. Mar. 21, 2019), the court explained that:

17                  Courts have found that evidence of use of a unique, secure username and
                    password may sufficiently authenticate a signature when that signature is
18                  a typed name inputted by the user. *See, e.g., Espejo*, 246 Cal. App. 4th at
                    1062. Similarly, the use of a checkbox to show acknowledgment and
19                  agreement with a specific policy document has also been found sufficient
                    where a unique, secure username and password was used to access the
20                  website containing the policy document. *See, e.g., Tanis v. Southwest
                    Airlines, Co., et al*, No. 18-CV-2333-BAS-BGS, 2019 WL 1111240, at
21                  *5-7 (S.D. Cal. March 11, 2019). Likewise, the act of inputting a
                    username and password, itself, has been found sufficient to constitute an
22                  electronic signature. *See, e.g., Hose v. Washington Inventory Services,
                    Inc.*, No. 14-CV-2869-WQH-WVG, 2016 WL 6427810, at *6-7 (S.D.
23                  Cal. August 30, 2016); *Taft v. Henley Enterprises, Inc.*, No. SACV 15-
                    1658-JLS (JCGx), 2016 WL 9448485, at *1-4 (C.D. Cal. March 2, 2016).

24
                    In all of these cases, authentication of the electronic signatures turned on
25                  the indicia of reliability demonstrated in the processes associated with use
                    of the username and password. These processes, and attendant
26                  explanations, are fact-specific and contextual; they may take many forms
                    yet still satisfy the burden of authentication. While it is true that some
27                  "courts have found the declaration of [ ] human resource employees
                    sufficient to authenticate electronic signatures," *Tagliabue v. J.C. Penney
28                  Corp., Inc.*, No. 1:15-CV-01443-SAB, 2015 WL 8780577, at *2 (E.D.
                    Cal. Dec. 15, 2015), the *content* of such declarations, rather than their

1    mere existence, is determinative for clearing the authentication threshold.

2    *Id.*, at *5.

3    ### III.    Discussion

4    CCS seeks to compel arbitration based on the allegation that White agreed to be bound by the

5    DRP "on at least two occasions" during her application and onboarding process in 2019. (Doc. 5 at 5.)

6    White challenges the validity of the purported arbitration agreement and the authenticity of her

7    electronic signature therein, contending that CCS fails to demonstrate that White "ever assented to or

8    signed" an arbitration agreement. (Doc. 7 at 5, 14-17.) She also asserts the agreement is illusory and

9    unconscionable, and that CCS waived its right to arbitration. (*See id*. at 9-14, 18-21.)

10    ### A.    Evidentiary Objections

11    As an initial matter, White raises several evidentiary objections to the declarations and exhibits

12    submitted by CCS in support of its motion to compel arbitration. (*See generally* Doc. 7-3.) First is the

13    Declaration of Nicole Adler and an exhibit attached to that declaration. (*See id*. at 2.) The Court does

14    not rely on this evidence, and thus, these objections are overruled as moot. White also objects to the

15    Declaration of Diane Wright and its accompanying exhibits based on (1) failure to comply with the

16    best evidence rule (Fed. R. Evid. 1002), (2) lack of personal knowledge (Fed. R. Evid. 602), and (3)

17    hearsay (Fed. R. Evid. 802, 803(6)).[3] (Doc. 7-3 at 2-8.)

18    "[A] court ruling on a motion to compel arbitration reviews the evidence on the same standard

19    as for summary judgment under Rule 56." *Alkutkar v. Bumble Inc.,* 2022 WL 16973253, at *3 (N.D.

20    Cal. Nov. 16, 2022). As to the documents themselves, at this stage, courts do not "focus on the

21    admissibility of the evidence's form," but rather "on the admissibility of its contents." *Sandoval v.*

22    *Cnty. of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021) (citations omitted). As another district court in

23    this Circuit explained, "except in the rare instances in which the objecting party demonstrates with

24    specificity that the subject evidence could not be produced in a proper format at trial, the court does

25    not consider any objections on the grounds that the evidence 'constitutes *hearsay* or inadmissible lay

26

27

28    ---
[3] White also cites Rule 902, which governs self-authenticating documents. Fed. R. Evid. 902. However, she does not explain the basis for her objections based on this Rule, and the Court declines to speculate as to what her objection could possibly be. Therefore, these objections are overruled.

opinion, or that there is a lack [of] *personal knowledge*.'" *Pierre v. IEC Corp.*, 2023 WL 3551962, at *4 (C.D. Cal. Mar. 14, 2023) (emphasis added). "Relatedly, objections based on a failure to comply with the technicalities of authentication requirements or the *best evidence rule* are inappropriate." *Id*. (emphasis added).

Given White's lack of specificity and that she does not dispute the validity of the documents themselves or suggest that CCS would be unable to present the documents in an admissible form at trial, these boilerplate objections are overruled. *See Ma v. Target Corp.*, 2018 WL 6265009, at *2 (C.D. Cal. July 30, 2018) ("[The plaintiff] repeatedly objects on foundation and authentication grounds to evidence attached to a declaration by [the defendant's] attorney. But [the plaintiff] doesn't dispute the actual validity of the documents … or suggest that [the defendant] wouldn't be able to present the documents and testimony in an admissible manner at trial. These objections are a waste.") (internal citations omitted).

With respect to evidence submitted by declaration, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be [but not necessarily are] admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4) (emphasis added). To the extent the Court relies, in this order, on evidence objected to on hearsay grounds, it does so because it finds the evidence could be presented in an admissible form at trial. *See Cherewick v. State Farm Fire & Cas.*, 578 F. Supp. 3d 1136, 1157 (S.D. Cal. 2022) ("[A]s long as a court finds that hearsay evidence could be presented in an admissible form at trial (i.e., through testimony from a witness laying the foundation exception or because the Court finds the evidence to be non-hearsay), it may consider the evidence when ruling on the motion for summary judgment."). Thus, White's remaining objections are also overruled.

### B.     Validity of the Agreement

#### 1.     Signature authentication

CCS contends that White agreed to arbitrate when she applied for a second term of employment in September 2019 and when she accepted CCS's employment offer the same day. (*See* Doc. 5 at 5-6.) To support this assertion, CCS attaches copies of the DRP, the "DRP - Applicant Agreement," and the "Conditional Offeree Agreement." (*See id.*; Exh. 1-3 to Wright Decl.) The

agreements appear to bear White's electronic signature, and as discussed above, California has recognized the validity of electronic signatures by way of the UETA. Cal. Civ. Code § 1633.9. Thus, CCS has met its initial burden of proving the existence of an arbitration agreement based on the 2019 agreements. However, because White contests the authenticity of the purported signature, CCS now bears the burden of proving, by a preponderance of the evidence, that White's signature is authentic.

To clear the authentication threshold, CCS offers the declarations of Diane Wright, who is the current Senior Director of Global People Relations for Conduent. (Wright Decl. ¶ 1; Supp. Wright Decl., Doc. 8-1 ¶ 1.) Ms. Wright explains CCS's typical application and onboarding process as well as White's 2019 hiring process specifically.

*a.     Conduent's application and onboarding process*

Ms. Wright asserts that in 2019, Conduent utilized an electronic onboarding system, named "iCIMS," which "allowed applicants and new hires to electronically complete, review, and sign documents" related to their employment. (Supp. Wright Decl. ¶ 14.) All applicants apply for employment through iCIMS, which can be accessed "by utilizing a personally created private login name and password." (*Id.* ¶ 15.) In the "Policy Consent" section of the application process, applicants are "electronically presented" with a complete, unabridged copy of the DRP via a pop-up screen, then "asked to affirmatively check a box" if they agree to be bound by the DRP. (*Id.* ¶ 17.) This section specifically states: "Applicants must agree to the terms of the Applicant Agreement and DRP to be considered for employment. Do you agree to the terms of the Applicant Agreement and DRP?" (*Id.*) Once an applicant agrees to be bound by the DRP by clicking the box, "[t]he system then affixes the applicant's name, as well as the date and time the confirmation is clicked, to the document being agreed to." (*Id.* ¶ 18.) To submit an application, an applicant must agree to be bound, though they may exit and reenter iCIMS without imposition of a time limit. (*Id.* ¶¶ 18-19.) Once submitted, CCS can view an applicant's profile and application but does not have access to modify an application or "manipulate any submitted information." (*Id.* ¶¶ 16, 20.)

Successful applicants receive a conditional offer of employment and must review and sign an offer acceptance form, an Offeree Agreement, and other offer acceptance paperwork through the iCIMS. (Supp. Wright Decl. ¶ 21.) Each form is presented in turn and the offeree must "click on an

electronic signature button that specifically acknowledges their agreement to the specific policy presented." (*Id.* ¶ 22.) Once clicked, the offeree is directed to enter their "individually-created private password to electronically sign" each document. (*Id.*) The offeree "must re-enter their password to affix their electronic signature to each form in the offer acceptance paperwork for the hiring process to be completed." (*Id.*) As with the Applicant Agreement, iCIMS then "affixes the applicant's name, as well as the date and time the confirmation is clicked, to the document being agreed to." (*Id.*) CCS cannot modify any information provided by the offeree. (*Id.*) Ms. Wright asserts that "[i]n [her] experience in [her] current role and in previous HR roles, these processes are a reliable way to determine whether and when an applicant, offeree, or an employee signed and agreed to the DRP." (*Id.* ¶ 23.)

### b.   *White's hiring process*

After White's separation from employment in June 2019, she "again applied for employment" on or around September 26, 2019. (Supp. Wright Decl. ¶¶ 25-26.) To complete her application, White "was required to log into the electronic application program [iCIMS] described above, utilizing her personally created login name and private password." (*Id.* ¶ 26.) In the Policy Consent section, White was presented with a complete copy of the DRP via pop-up window. (*Id.* ¶ 27.) She "then clicked her confirmation of agreement to the Applicant Agreement to be bound by the DRP," which specifically stated: "I have read this applicant mandatory arbitration agreement and agree to its terms. I have had the opportunity to read the DRP and I also agree to be bound by its terms." (*Id.* ¶ 28.)

Ms. Wright asserts that White's Applicant Agreement "indicates that [White] agreed to the DRP on September 26, 2019, at 11:50 a.m." (Supp. Wright Decl. ¶ 29.) White submitted her application and received a conditional offer the same day. (*Id.* ¶ 30.) To review and sign her offer acceptance paperwork, she was required to utilize her unique username and password. (*Id.* ¶ 31.) She then had to enter her password each time she wished to electronically sign a form, including the Offeree Agreement. (*Id.*) According to Ms. Wright, White signed the Offeree Agreement on September 26, 2019, at 1:41 p.m., which specifically stated: "I have read this conditional offeree mandatory arbitration agreement and agree to its terms. I have had the opportunity to read the DRP and I also agree to be bound by its terms." (*Id.* ¶¶ 32-33.) White "commenced her second stint of

1    employment … on or around September 30, 2019." (*Id*. ¶ 38.)

2               *c.*    *Analysis*

3        As mentioned above, it is the content of a supporting declaration, rather than its existence, that

4    determines whether a signature has been sufficiently authenticated. *Smith,* 2019 WL 1294443, at *5.

5    Some courts have found a signature was authenticated where the declaration provided specific

6    information regarding the process for electronically signing an arbitration agreement and, more

7    importantly, how the declarant reached his or her conclusion that the signature was "the act of" the

8    plaintiff.

9        For example, the declarant in *Espejo* "detailed [the defendant's] security precautions regarding

10    transmission and use of an applicant's unique username and password, as well as the steps an

11    applicant would have to take to place his or her name on the signature line of the employment

12    agreement and the DRP." 246 Cal. App. 4th at 1062. The signature process involved, in part, an

13    applicant receiving his unique username and password by phone "directly or orally," then being

14    required to reset his password "to one of his own choosing" upon logging into the company's

15    onboarding system for the first time before he could proceed to the next step. *Id*. at 1053. The plaintiff

16    was then prompted to accept or decline the agreement. *Id*. at 1054. If he accepted, he was prompted to

17    type his name as he would sign it, at which point the system "finalized" the agreement, including the

18    plaintiff's name, date, time, and IP address where he electronically signed. *Id.*

19        In addition to detailing the secure signature process, the court found that the declarant offered a

20    "critical factual connection" between that process and plaintiff's signature. *Id*. at 1062. The declarant

21    explained that the plaintiff's first, middle, and last name could only be placed on the agreements by

22    someone using his unique login information, and concluded that "[g]iven this process for signing

23    documents and protecting the privacy of the information with unique and private user names and

24    passwords," the plaintiff made the electronic signatures at the date, time, and IP address listed therein.

25    *Id*. at 1054. The court concluded that these details established that the signature was "the act of" the

26    plaintiff. *Id*. at 1062.

27        The court in *Tagliabue v. J.C. Penney Corp., Inc.*, reached the same conclusion as in *Espejo*,

28    while focusing on the connection shown by the sequence of the onboarding process rather than its

security. There, a senior human resources manager's declaration detailed "20 discrete steps" of the onboarding process, which every new hire must complete in order. 2015 WL 8780577, at *3 (E.D. Cal. Dec. 15, 2015). The court noted that the arbitration agreement was completed at step ten and that the plaintiff completed further onboarding steps thereafter. *Id*. The court also considered the presence of the plaintiff's electronic signature on other employment documents and that he re-signed the arbitration agreement when he was later promoted by the defendant. *Id.*

In *Taft v. Henley Enterprises, Inc.*, 2016 WL 9448485 (C.D. Cal. Mar. 2, 2016), the court also found the defendant met its preponderance burden where the declaration of its human resources manager explained the onboarding process, which consisted of discrete steps that must be completed in order, including a requirement that every new hire create a unique username and password to complete his or her onboarding documents. *Id*., at *3. The court considered the audit trail documenting each step the plaintiff took, in reverse chronological order, during her onboarding, which demonstrated that the plaintiff electronically reviewed and signed the arbitration agreement at a particular time. *Id*. The court also found it notable that a new hire could only proceed to the next step after completing all previous steps in the onboarding process, and the plaintiff appeared to have executed other onboarding documents before and after signing the arbitration agreement. *Id*.

On the other hand, courts have found electronic signatures not sufficiently authenticated where the declarations "summarily asserted" that the plaintiff signed the arbitration agreement. *See Ruiz v. Moss Bros. Auto Grp.*, 232 Cal. App. 4th 836, 843-44 (2014); *Smith*, 2019 WL 1294443, at *6. In *Ruiz*, the plaintiff's full name with "(Electronic Signature)" appearing adjacent to it, as well as a date and time, were printed below the signature and date lines on the arbitration agreement at issue. 232 Cal. App. 4th at 840. The defendant's initial declaration asserted that the same agreement is "presented" to "all persons who seek or seek to maintain employment" with the defendant, and that the plaintiff "electronically signed" the agreement "on or about" a specific date. *Id.* at 839.

After the plaintiff claimed that he did not recall signing the agreement, the defendant submitted a reply declaration explaining that "[e]ach employee is required to log into the [defendant's] HR system—each with his or her unique login ID and password—to review and electronically execute … the arbitration agreement." *Ruiz,* 232 Cal. App. 4th at 841. The court found that both declarations

failed to explain how the signature, date, or time came to be placed on the agreement, or how the declarant ascertained the signature was "the act of" the plaintiff. *Id.* at 843-44. The court reasoned that, for example, the declaration did not explain that an electronic signature in the plaintiff's name could only have been placed on the agreement by someone using the plaintiff's login information; that the date and time printed on the agreement indicated the date and time the signature was made; that all employees were required to use their unique login information to log into the HR system *and* to sign documents therein; or that this all led to the conclusion that the signature was "apparently made" by the plaintiff on the date and at the time printed on the agreement. *Id.* at 844.

As in *Espejo*, Ms. Wright's declaration explains the process for submitting an application as well as steps for accepting an offer of employment, which includes iCIMS's precautions for protecting an applicant's information, login name, and password. For example, a potential applicant personally creates their own login name and "private" password, as opposed to being assigned one or both. (Supp. Wright Decl. ¶ 15.) Conduent does not have access to modify an applicant's application or "manipulate any submitted information" during the application or offer acceptance processes. (*Id.* ¶¶ 16, 20, 22.) In addition, Ms. Wright details the steps an applicant must take to place their electronic signature on the application documents, including the Applicant Agreement, which involves clicking a box to agree to the DRP after a "complete, unabridged copy" of the DRP is presented to the applicant via a pop-up screen. (*Id.* ¶¶ 17-18.) She further explains that an application cannot be submitted unless and until the applicant agrees to be bound by the DRP. (*Id.* ¶ 18.) Ms. Wright next details how White specifically completed these steps of the application process on September 26, 2019. (*Id.* ¶¶ 26-29.)

Ms. Wright also details the typical steps for electronically signing offer acceptance forms: successful applicants receive a conditional offer of employment and utilize their unique username and password to access iCIMS to review and sign the offer acceptance paperwork; each form is presented in turn for the offeree's review and signature; the offeree then clicks a button acknowledging her agreement to "the specific policy presented" on each form, including the Offeree Agreement; once clicked, the offeree is prompted to enter their personally-created password on each corresponding form; once the button is clicked and password entered, iCIMS then affixes the offeree's name, as well as the date and time the button was clicked, to the document. (Supp. Wright Decl. ¶¶ 21-22.) The

14

offeree must repeat this process on each form for the hiring process to be completed. (*Id*. ¶ 22.) Ms. Wright also explains how White completed these onboarding steps on September 26, 2019. (*Id*. ¶¶ 30-33.) Therefore, the Court finds that Ms. Wright sufficiently explains how the signature, date, and time came to be placed on the agreements. *See Ruiz*, 232 Cal. App. 4th at 844.

Also akin to the declarant in *Espejo*, Ms. Wright concludes that, based on these procedures, White's electronic signatures on the Applicant Agreement and Offeree Agreement "could only have been placed on those agreements by a person using Ms. White's personally created login username and password. The electronic signatures on these documents were, therefore, made by Ms. White at the date and times indicated on each [Agreement]." (Supp. Wright Decl. ¶ 37.) Moreover, as Ms. Wright notes, the Application Agreement indicates White agreed to the DRP by electronically signing the document on September 26, 2019, at 11:50 a.m., and the Offeree Agreement indicates White agreed to the DRP by entering her password to electronically sign the document on September 26, 2019, at 1:41 p.m. (*Id*. ¶¶ 28-29, 31-32.) Thus, unlike in *Ruiz*, Ms. Wright has also explained in sufficient detail how she ascertained that the signature was "the act of" White. *See Ruiz*, 232 Cal. App. 4th at 844. CCS has therefore met its burden of authenticating White's signatures.[4]

### 2.    Mutual assent

White also challenges the validity of the purported agreement based on lack of mutual assent.

_____

[4] This conclusion does not apply to White's 2017 hiring process. White maintains that she "was not provided with any arbitration agreement or dispute resolution program form to sign in 2017." (White Decl. ¶ 3.) And, despite contending that the DRP "has been applicable to all employees … since … 2002," and recognizing that White was initially hired in 2017, (*see* Wright Decl. ¶¶ 10, 23; Supp. Wright Decl. ¶¶ 10, 35), CCS seeks to compel arbitration based solely the agreement from White's 2019 hiring process. (*See* Doc. 7 at 5, 10.) In its motion, CCS provides no information related to White's 2017 application or onboarding process, nor does it attach a copy or affirmatively assert the existence of an agreement to arbitrate resulting from that process. It is not until the filing of its reply brief that CCS contends White agreed to be bound by the DRP in 2019 *and* in 2017. (*See* Doc. 8 at 2, citing Supp. Wright Decl. ¶¶ 11, 29-36.) CCS also attaches, for the first time, what it purports are White's "electronically executed onboarding documents" from her 2017 hiring. (Supp. Wright Decl. ¶ 36, citing Exh. 4.)

Because CCS did not offer the 2017 agreement in its moving papers or mention such an agreement until filing its reply, it has not been "properly presented" to the Court and cannot be relied upon as grounds for relief. *See Ruiz v. Moss Bros. Auto Grp.*, 232 Cal. App. 4th 836, 846 (2014) (rejecting as grounds for relief an agreement that was raised for the first time in the reply brief and therefore, improperly before the court). Consequently, CCS fails to meet its initial burden of demonstrating an agreement to arbitrate based on White's hiring process in 2017. *Prostek*, 2023 WL 2588098, at *3; *Espejo*, 246 Cal. App. 4th at 1060.

(Doc. 7 at 7.) She argues that her declaration "clearly points out" that she "signed the paperwork, *including the documents containing the arbitration clauses*, without sufficient time to review[.]" (*Id.* at 8, citing White Decl. ¶¶ 4-5 (emphasis added).) White asserts she "do[es] not recall being provided with, seeing, reviewing, or signing, in any way, any document entitled Dispute Resolution Policy, or any other arbitration agreement." (White Decl. ¶ 8.) She contends she "was never asked to either accept or decline any terms or agree to arbitration" and was "simply signing forms" as a condition of employment. (*Id.* ¶ 7.) Finally, White asserts she "was never made aware that [she] was waiving [her] right to proceed with any claims in court. Had [she] ever been aware of an applicable arbitration agreement, and had [she] had the option to decline, [she] would have declined." (*Id.* ¶ 9.) CCS argues that the parties entered into a valid arbitration agreement because by being provided "an attached and/or linked" copy of the DRP and electronically signing the agreement to be bound by the DRP, "[White] was provided notice of the DRP and consented to be bound by it." (Doc. 5 at 10.)

"When determining whether a valid contract to arbitrate exists, we apply ordinary state law principles that govern contract formation." *Davis*, 755 F.3d at 1093. "It is undisputed that under California law, mutual assent is a required element of contract formation." *Knutson v. Sirius XM Radio Inc.,* 771 F.3d 559, 565 (9th Cir. 2014). "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Serafin v. Balco Properties Ltd., LLC*, 235 Cal. App. 4th 165, 173 (2015). Written or spoken words or conduct may manifest mutual assent, and action or inaction may imply acceptance of contract terms. *Id.* This includes clicking a button to assent to an agreement. *Tagliabue*, 2015 WL 8780577, at *4 (citing *Levin v. Caviar, Inc.*, 146 F. Supp. 3d 1146, 1157 (N.D. Cal. 2015); *Mohamed v. Uber Techs., Inc.*, 109 F. Supp. 3d 1185, 1195 (N.D. Cal. 2015)).

Although White now claims she does not recall signing an arbitration agreement, as discussed above, the evidence demonstrates otherwise. That White "was simply signing forms" without reviewing their contents is inconsequential. An individual "who signs a written agreement generally is bound by its terms, even though he neither reads it nor considers the legal consequences of signing it." *Operating Engineers Pension Trust v. Gilliam*, 737 F.2d 1501, 1504 (9th Cir. 1984); *see also Smith*,

2019 WL 1294443, at *3 (E.D. Cal. Mar. 21, 2019) ("If Plaintiff provided valid consent to the agreement(s), it is of no moment that he alleges he did not read them[.]"); *Tagliabue*, 2015 WL 8780577, at *4 ("Under California law, Plaintiff cannot avoid the terms of the contract by asserting that he failed to read it before signing."). The language on the signature pages of both agreements clearly informed White of the specific policy she was agreeing to. The titles and content of the agreements contained the word "arbitration." The DRP was not an "inconspicuous contractual provision[]," *Tanis v. Sw. Airlines, Co.*, 2019 WL 1111240, at *6 (S.D. Cal. Mar. 11, 2019), or a policy "buried among a host of other policies." *Serafin v. Balco Properties Ltd., LLC*, 235 Cal. App. 4th 165, 173 (2015).

White's assertion that she was not afforded sufficient time to review the forms prior to signing is equally unavailing. To the contrary, Ms. Wright declares that "[a]n applicant is not required to complete their application within a specific time frame, and the system permits the applicant to exit and reenter the program. Therefore, applicants can take as much time as they like to review the Company policies and seek advice prior to indicating their agreement and submitting their application." (Supp Wright Decl. ¶ 19.) White, on the other hand, contends that "agents" of CCS told her that she was signing the same onboarding paperwork she had signed when she was first hired by CCS in 2017. (*See* White Decl. ¶ 6.) Without more, that White construed such a statement to mean she did not need to read the terms of the agreements she was provided does not demonstrate a lack of mutual assent. It is White's "outward manifestations of consent," not her "unexpressed intentions or understandings," that control. *Serafin*, 235 Cal. App. 4th at 173. Therefore, White, "knowing that an offer [had] been made to [her] but not knowing all of its terms, may be held to have accepted, by [her] conduct, whatever terms the offer contains." *Knutson,* 771 F.3d at 565 (internal quotation marks omitted).

Because White executed an Applicant Agreement and an Offeree Agreement, agreeing in both to be bound by the DRP, the Court finds there is a valid agreement to arbitrate in existence.

**C.    Enforceability of the Agreement**

In the alternative, White asserts "the alleged agreement fails as it is both illusory and unconscionable, riddled with defects prohibited by applicable California law governing employment

17

arbitration agreements." (Doc. 7 at 6.) She argues the agreement is unenforceable as illusory because it gives CCS the unilateral right to modify or terminate the agreement at any time. (*Id*. at 9-11.) White also contends the DRP is procedurally and substantively unconscionable because it is a contract of adhesion, it fails to provide the arbitration rules under JAMS or AAA, and its terms are illusory. (*Id*. at 11-14.)

### 1.    Illusory contract

A contract will be held to be unenforceable as illusory when one of the parties has the unfettered or arbitrary right to modify or terminate the agreement or assumes no obligations under the contract. *See State Farm Gen. Ins. Co. v. Watts Regulator Co.*, 17 Cal. App. 5th 1093, 1103 (2017); *Harris v. TAP Worldwide, LLC*, 248 Cal. App. 4th 373, 385 (2016); *see also Asmus v. Pacific Bell*, 23 Cal. 4th 1, 15-16 (2000).

The Court does not find that the DRP is illusory. It is true that only CCS has the authority to amend or terminate the DRP. (DRP §§ 6-7.) However, before amendment or termination can occur, CCS is required to give White 30 days' notice. (*See id.*) An amendment does not apply to a "Dispute" that was made known to CCS before the amendment takes effect, and termination does not apply to a "Dispute" that accrued or became known to CCS prior to the effective date of termination. (*Id*.) In other words, once CCS gives an employee 30 days' notice of an amendment to, or termination of, the DRP, to preserve the existing agreement, the employee need only tell CCS about a "Dispute" before the amendment or termination takes effect. These are limits on CCS's ability to modify or terminate the DRP. The California Supreme Court has recognized that "the fact that one party reserves the implied power to terminate or modify a unilateral contract is not fatal to its enforcement, if the exercise of that power is subject to limitation, such as fairness and reasonable notice." *Asmus*, 23 Cal. 4th at 16; *Harris*, 248 Cal. App. 4th at 388; *cf. Casas v. Carmax Auto Superstores Cal., LLC*, 224 Cal. App. 4th 1233, 1236 (2014).

Moreover, the implied covenant of good faith and fair dealing applies to discretionary clauses like the DRP's amendment and termination clauses. *See Harris*, 248 Cal. App. 4th at 388; *Peng v. First Republic Bank*, 219 Cal. App. 4th 1462, 1473-74 (2013); *Serpa*, 215 Cal. App. 4th at 708; *24 Hour Fitness v. Superior Ct.*, 66 Cal. App. 4th 1199, 1214 (1998). The covenant of good faith and fair

dealing prevents CCS from unilaterally exercising its discretionary authority of modification or termination in such a manner as to frustrate the purpose of the DRP, and thus, prevents the DRP from being deemed illusory. *See Harris*, 248 Cal. App. 4th at 388; *Peng*, 219 Cal. App. 4th at 1473-74; *Serpa*, 215 Cal. App. 4th at 708; *24 Hour Fitness*, 66 Cal. App. 4th at 1214; *see also Fuentes v. Empire Nissan, Inc.*, 90 Cal. App. 5th 919, 934-35 (2023). Therefore, the express limits within the DRP's modification and termination provisions, combined with the limitations imposed by the implied covenant of good faith and fair dealing, are sufficient to show that the DRP is not illusory.[5]

## 2.      Unconscionability

Unconscionability is a recognized basis to invalidate an arbitration agreement. *See Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021); *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1259 (9th Cir. 2017). The party opposing arbitration has the burden of establishing that an arbitration agreement is unconscionable. *See Lim*, 8 F.4th at 999; *Poublon*, 974 F.3d at 1060. State law determines whether an agreement is invalid due to unconscionability. *See Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1059 (9th Cir. 2020); *Kilgore v. KeyBank Nat'l Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013). Under California law, unconscionability has a procedural element and a substantive element. *See OTO, LLC v. Kho*, 8 Cal. 5th 111, 125 (2019); *Iyere v. Wise Auto Grp.*, 87 Cal. App. 5th 747, 759 (2023), *review denied* (Apr. 26, 2023). The procedural element addresses the circumstances of contract negotiation and formation, focusing on oppression and surprise due to unequal bargaining power, while the substantive element pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided. *OTO*, 8 Cal.5th at 125; *see Lim,* 8 F.4th at 1000-01; *Poublon*, 846 F.3d at 1260-61; *Iyere*, 87 Cal.App.5th at 759. While both the procedural and substantive elements must be present to establish unconscionability, they need not be present in the

---

[5] As White correctly points out, at least one California court has held that an agreement to arbitrate is illusory if the employer can make unilateral modifications. *See Sparks v. Vista Del Mar Child & Family Services*, 207 Cal. App. 4th 1511, 1523 (2012). *Sparks*, however, has been distinguished and criticized on this point. *See Harris*, 248 Cal. App. 4th at 386-90; *Casas v. Carmax Auto Superstores Cal., LLC,* 224 Cal. App. 4th 1233, 1236 (2014); *Serpa*, 215 Cal. App. 4th at 708. In fact, the same appellate district that decided *Sparks* reconsidered it and found to the contrary in light of *Asmus* and subsequent disagreement from other courts of appeal. *See Harris*, 248 Cal.App.4th at 390. Given the Court's above analysis, as well as *Harris*'s disavowing of *Sparks*, the Court declines to follow *Sparks*.

same degree. *Lim*, 8 F.4th at 1000; *Baltazar v. Forever 21, Inc.*, 62 Cal.4th 1237, 1243 (2016). There is essentially a "sliding scale" that applies, and the more one element is present, the less present the other element need be. *See Lim*, 8 F.4th at 1000; *Baltazar*, 62 Cal.4th at 1243-44.

### a.      Procedural unconscionability

The procedural unconscionability analysis begins by determining whether the agreement is a contract of adhesion, which is a standardized contract offered by the party with superior bargaining power on a take-it-or-leave-it basis. *OTO*, 8 Cal.5th at 126; *see also Lim*, 8 F.4th at 1000-01. If a contract is one of adhesion, courts must assess whether the circumstances of the contract's formation created such oppression or surprise that closer scrutiny of the contract's overall fairness is required. *See OTO*, 8 Cal.5th at 126. "Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form." *Id.* Employment contracts are typically contracts of adhesion. *Id.* However, "if an employee must sign a non-negotiable employment agreement as a condition of employment but 'there is no other indication of oppression or surprise,' then 'the agreement will be enforced unless the degree of substantive unconscionability is high.'" *Poublon*, 846 F.3d at 1261 (citation omitted).

There is no dispute that the DRP is a contract of adhesion. White was required to sign as a condition of employment and had no ability to opt out or renegotiate the DRP's terms. This is sufficient to show at least some procedural unconscionability. *See Poublon*, 846 F.3d at 1261-62; *Ramirez v. Charter Communications, Inc.*, 75 Cal. App. 5th 365, 373 (2022).

White contends that although the DRP references JAMS and the AAA, the rules of those institutions are not provided, which is procedurally unconscionable. (*See* Doc. 8 at 13.) The Court disagrees. In *Baltazar*, the California Supreme Court found that its procedural unconscionability analysis was unaffected by the fact that the defendant did not provide a copy of the AAA rules to the plaintiff. *See Baltazar*, 62 Cal. 4th 1237, 1246 (2016). *Baltazar* left open the possibility that there may be procedural unconscionability based on "artfully hidden" terms within documents incorporated by reference, including terms hidden within an arbitrator's rules. *See id.* However, like the plaintiff in *Baltazar*, White does not identify any applicable rule of either the AAA or JAMS that is somehow surprising or unconscionable. Therefore, the fact that CCS did not provide White with copies of the

AAA or JAMS rules does not show any additional procedural unconscionability. *See id.* Thus, there is a degree of procedural unconscionability only to the extent that the DRP is a contract of adhesion.[6]

### b.    Substantive unconscionability

Substantive unconscionability examines the fairness of a contract's terms and is concerned about terms that are unreasonably favorable to the more powerful party. *Lim*, 8 F.4th at 1001-02; *OTO*, 8 Cal.5th at 129. "Unconscionable terms impair the integrity of the bargaining process or otherwise contravene the public interest or a public policy or attempt to impermissibly alter fundamental legal duties. They may include fine-print terms, unreasonably or unexpectedly harsh terms regarding price or other central aspects of the transaction, and terms that undermine the nondrafting party's reasonable expectations." *OTO*, 8 Cal.5th at 130 (quoting *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal.4th 1109, 1145 (2013)); *see also Gostev v. Skillz Platform, Inc.*, 88 Cal. App. 5th 1035, 1054 (2023). "Substantive terms that, in the abstract, might not support an unconscionability finding take on greater weight when imposed by a procedure that is demonstrably oppressive." *OTO*, 8 Cal.5th at 130.

To support a finding of substantive unconscionability, White relies on its earlier argument that the DRP is an illusory agreement because CCS retains the unilateral ability to modify or terminate the agreement. For the reasons discussed above, the DRP's terms are not illusory. Thus, the modification and termination clauses are not substantively unconscionable and as a result, White's unconscionability argument fails. *See Peng*, 219 Cal. App. 4th at 1474.

### 3.    Waiver

White argues absent a finding in enforceability, CCS "has waived its right to arbitration due to delay." (Doc. 7 at 18.) To determine if a party seeking to compel arbitration has waived that right, courts consider two elements: (1) knowledge of an existing right to compel arbitration; and (2) intentional acts inconsistent with that existing right." *Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457, 468

---

[6] White also argues that California Labor Code § 432.6 prohibits mandatory employment arbitration agreements. (Doc. 7 at 12.) However, the Ninth Circuit has since held that in light of the Federal Arbitration Act's "purpose [] to further Congress's policy of encouraging arbitration," Assembly Bill 51, which added Labor Code § 432.6, stood "as an obstacle to that purpose," and was "therefore preempted." *Chamber of Com. of the United States of Am. v. Bonta*, 62 F.4th 473, 487 (9th Cir. 2023). Thus, White's reliance on § 432.6 is improper.

1  (9th Cir. 2023).[7] As to the first element, there is no dispute that CCS had knowledge of its right to

2  compel arbitration, and thus, this requirement is satisfied.

3         In determining whether a party took acts inconsistent with a right to arbitration, courts

4  "consider the totality of the parties' actions" by asking "whether those actions holistically 'indicate a

5  conscious decision … to seek judicial judgment on the merits of the arbitrable claims, which would be

6  inconsistent with a right to arbitrate.'" *Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011, 1015 (9th

7  Cir. 2023) (quoting *Hill*, 59 F.4th at 473 n.19). Under this precedent, "[a] party generally 'acts

8  inconsistently with exercising the right to arbitrate when it (1) makes an intentional decision not to

9  move to compel arbitration and (2) actively litigates the merits of a case for a prolonged period of time

10  in order to take advantage of being in court.'" *Fox v. Experian Info. Sols., Inc.*, --- F. Supp. 3d ----, ----

11  , 2024 WL 755804, at *4 (E.D. Cal. Feb. 23, 2024) (quoting *Armstrong*, 59 F.4th at 1015).

12         To demonstrate that CCS acted inconsistently with its right to arbitration, White submits the

13  declaration of her counsel, David Keledjian. (Doc. 7 at 20.) In his declaration, Mr. Keledjian asserts

14  that on October 13, 2022, his firm mailed a request for a copy of White's personnel file ("PFR") to

15  CCS. (Doc. 7-1, Declaration of David Keledjian ("Keledjian Decl.") ¶ 2.) The request states, in part,

16  that:

17              **IF YOU DO NOT SEND ANY EXISTING ARBITRATION**
            **AGREEMENT, THIS WILL CONSTITUTE A WAIVER OF ANY**

18              **RIGHT TO LATER COMPEL ARBITRATION. BY NOT**
            **SENDING AN ARBITRATION AGREEMENT IN RESPONSE TO**

19              **THIS REQUEST, YOU ARE ACTING INCONSITENTLY [sic]**
            **WITH YOUR RIGHT TO ASSERT ARBITRATION PURSUANT**

20              **TO ANY AGREEMENT THAT MAY EXIST.**

21  (Exh. 1 to Keledjian Decl.) Mr. Keledjian asserts that "[n]either [CCS] nor its Counsel remitted any

22  agreements to arbitrate signed by [White] … in response to this PFR." (Keledjian Decl. ¶ 3.) Mr.

23  Keledjian states that on November 28, 2022, his firm mailed another PFR "contain[ing] the same

24  requests and us[ing] identical language" to the first PFR. (*See id.* ¶ 4.) "Having not heard from [CCS]

25

26

27  [7] Until recently, the party opposing arbitration was required to demonstrate a third element: "prejudice to the party opposing arbitration resulting from such inconsistent acts." *Madrid*, 2020 WL 4274218, at *6 (quoting *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694 (9th Cir. 1986)). However, the Supreme Court's decision

28  in *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022) "eliminated the prejudice requirement as an element from any arbitration waiver test." *Hill*, 59 F.4th at 468.

regarding" these requests, White proceeded to file a complaint on December 15, 2022. (*Id.* ¶ 5.) "[D]espite being put on notice" of the claims, White contends that CCS's counsel did not email White's counsel "alleging the existence of a DRP" until January 5, 2023, "nearly one month after" White's complaint was filed. (Doc. 7 at 20; Keledjian Decl. ¶ 6.) White also notes that CCS did not remove the action to this Court until "[m]ore than two months later." (Doc. 7 at 21.) As of the filing of her opposition brief, White contends that "[n]early five months" had passed since her initial PFR was mailed. (*Id.*) In sum, White contends CCS acted inconsistently with its right to arbitrate "by not producing the PFR in a timely manner." (*Id.*) The Court does not agree.

CCS asserts White "has made no showing that [CCS] made an intentional decision not to move to compel arbitration, nor that [CCS] actively litigated the merits of the case for a prolonged period of time (or at all) in order to take advantage of being in court." (Doc. 8 at 9.) Rather, CCS contends it was served with the complaint on December 29, 2022, and its counsel emailed White's counsel regarding the existence of the DRP just one week later. (*Id.*) CCS asserts its counsel sent additional emails, and counsel for the parties met and conferred in February 2023, "where they discussed arbitration." (*Id.* at 10.) According to CCS, White's counsel notified CCS that it intended to challenge arbitration on March 1, 2023. (*Id.*) CCS filed the instant motion to compel arbitration the following day, March 2, 2023. (*Id.*) CCS also notes that prior to removing the case, it raised arbitration as an affirmative defense in its answer in state court. (*Id.*)

White makes no showing of an intentional decision not to arbitrate, nor does she demonstrate that CCS litigated this case's merits, actively or otherwise, for any amount of time. To the contrary, CCS filed the instant motion approximately five weeks after removing this action and one day after being notified of White's intent to challenge arbitration. The parties have not conducted discovery and CCS has filed no dispositive motions. Therefore, White fails to demonstrate that CCS acted inconsistently with its right to arbitrate—thereby waiving that right—by failing to respond to the PFRs alone.

### D.   Scope of the Agreement

To determine whether an arbitration agreement encompasses particular claims, the Court looks to the plain language of the agreement, and "[i]n the absence of any express provision excluding a

particular grievance from arbitration … only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584-86 (1960).

There is no dispute regarding the scope of the DRP. By its express terms, the DRP covers all "Disputes" (as defined by the DRP) "related to or arising out of a current, former or potential employment relationship with [CCS]." (DRP § 1.) The terms "arising out of" and "related to" are broad terms. *Cape Flattery Ltd. v. Titan Mar., LLC,* 647 F.3d 914, 922 (9th Cir. 2011). Moreover, the DRP defines a "Dispute" as "all legal and equitable claims, demands, and controversies, of whatever nature or kind, whether in contract, tort, under statute, regulation, or ordinance, or some other law, between persons (which include Employees, Applicants and the Company) bound by the DRP or by an agreement to resolve Disputes under the DRP, or between a person bound by the DRP and a person or entity otherwise entitled to its benefits …." (DRP § 2.e.) Such claims include, *inter alia*, those "related to or concerning the relationship between … the Employee and the Company alleging violation of any federal, state, or other governmental law," including, but not limited to, allegations of unlawful retaliation, discrimination or harassment based on disability status, infliction of emotional distress, wrongful discharge, failure to pay wages, and claims for benefits. (DRP § 2.e.vii.) Based upon these broad specifications, it is clear that the alleged discrimination and retaliation, and wrongful termination laws are claims encompassed by the arbitration agreement.

### E.      Attorney's Fees

As a final matter, CCS seeks an award of attorney's fees and expenses incurred during these proceedings based on White's filing of this action despite agreeing to arbitrate, as well as White's lack of response to CCS's meet and confer efforts. (*See* Doc. 5 at 12.) White's opposition did not address the matter.

Generally speaking, there must be a prevailing party in order to award attorney's fees. *See* Cal. Civ. Code § 1717(b)(1). An order resolving a request to compel arbitration only establishes a "prevailing party" if the petition to compel arbitration is a "discrete proceeding." *AKS Trade Co., LLC v. Americap Direct Corp.*, 2023 WL 2752486, at *2 (E.D. Cal. Mar. 31, 2023) (citing *Roberts v. Packard, Packard & Johnson*, 217 Cal. App. 4th 822, 834 (2013)). The court in *AKS Trade* explained:

1
2
3
4
5
6

> The key distinction is whether the case involves a motion to compel arbitration filed *within* an existing lawsuit or a petition to compel arbitration that *commences* an independent lawsuit. *Id.* If the motion to compel arbitration is filed *within* an existing lawsuit, the motion is *not* a discrete proceeding and there is no prevailing party resulting from the disposition of the motion. *Id.* If the motion to compel arbitration is filed and there is no pending lawsuit, then it is a discrete proceeding where the prevailing party could appropriately request attorney's fees. *Id.* In other words, "when a party defeats an independent petition to compel arbitration, the action is terminated and the prevailing party on the petition is entitled to fees under Civil Code [§] 1717."

7   *AKS Trade*, 2023 WL 2752486, at *2 (quoting Roberts, 217 Cal. App. 4th at 840) (emphasis in

8   original).

9       White filed a complaint in state court alleging, among other things, discrimination and

10  retaliation. After CCS removed the action to this Court, it moved to compel arbitration. The action is

11  not a discrete proceeding. Resolving the parties' arbitrability dispute does not resolve White's

12  underlying claims. In other words, "[b]y prevailing on the motion to compel, [CCS] did not prevail on

13  the underlying claims. [CCS's] motion is premature." *Anderson Plant, LLC v. Batzer Const., Inc.*,

14  2014 WL 2093479, at *4 (E.D. Cal. May 19, 2014). Thus, CCS's request for attorney's fees is

15  **DENIED** without prejudice.

16  **IV.     Conclusion and Order**

17      CCS has moved to compel arbitration of White's claims. As discussed above, the DRP is a

18  valid arbitration agreement between CCS and White, and White's claims are within the scope of the

19  DRP. Under these circumstances, the Court must grant CCS's motion and order the parties to submit

20  their disputes to arbitration pursuant to the terms of the DRP.

21      Based upon the foregoing, the Court **ORDERS**:

22      1.      Defendant's motion to compel arbitration (Doc. 5) is **GRANTED**.

23      2.      Defendant's request for attorney's fees (Doc. 5 at 12) is **DENIED**.

24      3.      The parties **SHALL** submit all claims pending in this matter to arbitration in

25              accordance with the DRP.

26  ///

27  ///

28  ///

25

///

4.      The Clerk of the Court is directed to **CLOSE** this case.

IT IS SO ORDERED.

Dated:   __**October 2, 2024**__

UNITED STATES DISTRICT JUDGE